## The Bay City and East Saginaw Railroad Company v. David M. Austin.

*Railroad companies; And their agents: Liability for neglect to maintain fences: Presumption from defective condition.* A railroad corporation operating the road of another corporation under a contract is an agent of the latter company within the meaning of § 43 of the general railroad act (*Comp. Laws, § 1987*); and the neglect by such agent of the duty to erect or maintain fences along the line of the road, enjoined by the statute, will render the corporation owning the road liable for all consequent damages. The object of the amendment to this section by the law of 1867 (*Laws of 1867, p. 221*) was to give to the injured party a right of action, at his election, against either the principal or the agent for such damages.

It being the duty of the railroad company to erect and maintain the fence, if it be insufficient or out of repair, in the absence of any proof showing an extraordinary cause for such condition, the company will be liable for the consequences resulting to the property of any person having an interest in the maintenance of the fence, and not shown to be in fault for such defective condition.

*Double damages: Construction of statutes: Vested rights.* A statute which authorizes a judgment to be entered for double the damages found by the jury, is in the nature of a penal statute, the repeal of which before judgment, though after verdict, will defeat the right to such recovery,—no personal equity to such right, underlying the law or arising upon it, appearing.

*Heard July 11. Decided October 6.*

Error to Saginaw Circuit.

This was an action on the case brought by David M. Austin in the Circuit Court for the County of Saginaw, against the Bay City & East Saginaw Railroad Company. The plaintiff set forth in his declaration the corporate character of the defendant; the location of its road, its duty under the statute to erect and maintain fences along the sides of its road, and the neglect of this duty, in consequence of which, a horse of the plaintiff's, straying upon the road, was killed. The defendant pleaded the general issue. On the trial it appeared that the road where the injury occurred was in the possession of, and operated by, a corporation created under the laws of the State of Michigan, known as the Flint & Pere Marquette Railway Company, under a contract with the defendant. Under the charge of the Court the jury found a verdict for the plaintiff for $212.04; on which, on plaintiff's motion, a judgment was entered in double the amount; which judgment comes into this Court by writ of error. The questions for review are sufficiently stated in the—

Assignment of Errors. 1st. The Court erred in refusing to charge the jury as requested, "that if the jury find that the track of the defendant was at the time of the accident operated by the Flint & Pere Marquette Railway Company, and that the horse was killed by the engine of the Flint & Pere Marquette Railway Company, which was the only company at that time operating trains on the defendant's track, then the defendant is not liable in this action."

2d. The Court erred in charging the jury, in lieu of the charge requested as stated in the foregoing assignment, as follows: "I decline to give the jury this instruction, for the reason that if the jury find that the Flint & Pere Marquette Railway Company were operating it, although it may be exclusively their occupancy under the contract that

has been read, it was operated within the sense of this statute by the Flint & Pere Marquette Railway Company as the agent of the defendant."

3d. The Court erred in refusing to charge the jury as requested, that "the bars having been put in for the accommodation of the farm crossing, it was the duty of the person in charge of the farm to keep the bars up, and if they were out of repair, it was his duty to call the attention of the defendant, or its servants or officers, to that fact, and if he failed to keep up such bars or to give such notice, he was guilty of negligence which will defeat a recovery for damages resulting therefrom."

4th. The Court erred in charging the jury in response to the request mentioned in the previous assignment, as follows: "That request I cannot comply with. It seems to devolve upon the person in charge of the farm to exercise a supervision which is a part of the duty of keeping a fence in repair. It supposes that the person in charge of the farm, if he found the bars down, must put them up; that duty devolves on the defendant. But if the plaintiff should let the bars down himself, it would be his duty to put them up as well as they were before he let them down, and if the defect in the fence or in the bars arose from ill usage by the plaintiff or by McKay (who had charge of plaintiff's horse), and the defect did not come to the knowledge of the defendant, the plaintiff cannot recover. If a defect arose after the bars were originally made, otherwise than by ill usage from the plaintiff or from McKay, it would not be the duty of McKay or the person in charge of the farm to give any notice about it; the defendant was bound to take notice if the fence got out of repair on account of ordinary wear or the ordinary effect of the elements; it was the duty of the defendant to take notice of it."

5th. The Court erred in refusing to charge the jury as requested that "if the person in charge of the farm was not satisfied with the sufficiency of the fence, it was his duty to notify the defendant thereof; and if the parties could not agree, to have the question settled by the fence-viewers, as provided by law in case of partition fences."

6th. The Court erred in refusing to charge the jury as requested, that "if the jury find that the defendant has never run trains on its road, has never had engine nor cars thereon, then the plaintiff cannot recover in this action."

7th. The Court erred in refusing to charge the jury as requested, that "the duty to erect and maintain fences along railroad tracks is imposed upon the person or corporation occupying or using the track, and if the defendant had parted with the use and occupancy of its track to other persons or to any other corporation so as to give such other person or corporation an exclusive right to use and control the track for a definite time, then the duty to erect and maintain fences devolves upon the party occupying the track, and no recovery can be had against the defendant."

8th. The Court erred in charging the jury relative to the request mentioned in the seventh assignment as follows: "I can give you all that instruction except the last proposition, 'that no recovery can be had against the defendant.' I decline that part of it. So long as the defendant remains the owner and the road is being operated by persons who stand in the relation of agent to the defendant, it is liable for all damages arising from neglect to erect and maintain fences."

9th. The Court erred in refusing to charge the jury as requested that "the duty to erect and maintain fences does not devolve on two corporations at the same time, when

21 MICH.—X².

only one is in the exclusive charge and control of the track and roadway, and the plaintiff cannot recover except against the corporation which is in possession and using the track."

10th. The Court erred in giving judgment for double the damages assessed by the jury, there being then no law in force authorizing such judgment."

*W. L. Webber*, for plaintiff in error.

I. The 1st, 2d, 6th, 7th, 8th, and 9th assignments relate substantially to the same question, and will be considered together.

The defendant below was organized as a corporation and commenced the construction of its road. Before any iron was laid the possession of the line passed to the Flint & Pere Marquette Railway Company, to the entire exclusion of the defendant below. The F. & P. M. R'y Co. constructed the road, and was the only company which had run its cars on the track. The employees were all in employ of the last-named company. The F. & P. M. Co. was not the agent of the B. C. & E. S. R. R. Co. in any sense. Unless the term "agent" is to be changed in its definition so as to be used in an entirely new sense, it is a misnomer to speak of the F. & P. M. R'y Co. as the *agent* of the B. C. & E. S. R. R. Co. The original section 43 of the general railroad act provides that "every railroad corporation formed under this act shall erect and maintain fences, * * * * and until such fences * * shall be duly made, THE *corporation* and its agents shall be liable," etc. As amended in 1867, p. 221, it shows that it was the intention to confine the liability to the single corporation or person, who was the one on whom the liability rested to erect and maintain the fence, and that it was not

contemplated to hold more than one party liable at one time.

The horse in the case at bar was killed by the engine of the F. & P. M. R'y Co., run by its agents, and not by the agents, engines, or cars of the defendant below.

II. As to the 3d and 4th assignments: The farm where these bars were was in the possession of McKay, with whom Austin was pasturing his horse. The railroad company had no charge of the farm and had no use for the bars. No one had a right to pass through the bars except by consent of the person in charge of the farm.

Now, what is the object of the statute requiring fences along railroad tracks? For the protection of the lives of passengers, clearly. Every one knows that very many accidents arise from trains being thrown from the track by running over animals on the track, and in this very case the engine was thrown from the track, but fortunately no one was injured. The company is to *maintain* the fence, but that does not require them to have a man stationed at every ten rods to see that no one tears it down. They are to maintain it as against the ordinary action of the elements, to use diligence to keep it in repair, but they are not insurers against accidents to it, nor against the vicious acts of trespassers who may intentionally destroy it, for the purpose of injuring the property of the farmer or the railroad company. To carry out the object of the statute it would seem to be proper to require the person in charge of the farm as well as the railroad company, to exercise diligence in keeping the bars up. Yet under the charge to the jury, if the bars were thrown down by a trespasser, and the farmer saw them down and knew his horses were at pasture there, and liable to escape from the field to the track, yet he is under no obligation to put them up. We claim that if the person in charge found the bars down it

was his duty to put them up. If he found them out of repair it was his duty to put them in repair at once. Where consequences so great may result from the omission to do so, to hold any other rule would be dangerous. Even if he is to call on the company for compensation for repairs, still he should not allow the fence to be out of repair to the danger of human life. The rule cannot be held too strict.

III. The 5th assignment. The requirement is to have a "fence of the height and strength of a division fence required by law." What is the height and strength required by law? The only law we have on the subject is *Chapter 14 of Comp. Laws, p. 248, § 605.* By this provision of law the judgment of the fence-viewers is the final decision of the proper height and strength of a railroad fence. If this be not so, then there seems to be no means provided to determine the question as to height and strength of the fence, and perhaps till such a standard shall be provided, the law may be held inoperative as being an incomplete expression of the legislative will.

IV. The 10th assignment. The horse was killed in August, 1868. The suit was commenced in November, 1868. The issue was joined by filing plea, April, 1869. The cause was tried before a jury, and verdict for $212.04 rendered on 22d of June, 1869. Judgment was rendered October 9, 1869, for double damages, $424.08.

The act of 1855, § 43, allowed single damages only. In 1867 the act was amended and double damages allowed. By act of March 13, 1869 (*Laws 1869, Vol. 1, p. 49*), the clause for double damages is stricken out, and the rule again was single damages. This act of 1869, approved March 13, 1869, took effect in ninety days from April 5, 1869, that being the date of final adjournment of the Legislature. The amendment therefore became law on the

*fifth* day of July, 1869. The duty to fence the track is imposed by the statute. The right to maintain an action for damages in case of the loss of animals killed by trains, is a right given by statute. Before this statute there was no such duty, no such right.—*Williams v. Mich. Cent. R. R. Co., 2 Mich., 259.*

The *double* damages given by the act of 1867 are given as a penalty. The excess over actual damages is nothing but a penalty. It is not founded upon any *right* in the owner of the animal, for in cases of ordinary torts the plaintiff only recovers his actual damages. It is founded solely on the statute, and is in the nature of a penalty.

The plaintiff has no *vested right* to the double damages nor to any damages. He is in the wrong in allowing his animals to stray off his own lands. As said above, his right depends exclusively upon the statute. In this case, before judgment was entered, the statute of 1869 took effect, and the statute for double damages ceased to exist.—*Key v. Goodwin, 4 Moore & Payne, 341, 351; Smith's Com. on Stat. and Const. Law, § 797, p. 880; Butler v. Palmer, 1 Hill, 324; Tivey v. People, 8 Mich., 128; Norris v. Crocker, 13 How., 429; Williams v. County Commissioners, 35 Me., 345; Engle, adm'r. v. Shurts, 1 Mich., 150; Campau v. Gillett, 1 Mich., 416; Sedgwick on Stat. and Const. Law, 129 to 131; O. Bank v. Freeze, 18 Maine, 109; Welch v. Wadsworth, 30 Conn., 149; Washburn v. Franklin, 35 Barb., 599; People v. Livingston, 6 Wend., 540.*

At the time this judgment was rendered there was no law in force authorizing a judgment for more than the amount of damages assessed by the jury. The Court therefore had no jurisdiction to give a judgment for double the verdict.

*D. W. C. Gage,* for defendant in error.

I. The 1st, 2d, 6th, 7th, 8th and 9th assignments of error are based upon the assumption that plaintiff in error, by occupying and operating its railroad through an agent, or agents, avoided the duty of erecting and maintaining fences on the sides of its road, and the liability for neglecting that duty.

Section 1987 C. L., as amended L. 1867, p. 221, imposes the duty and liability upon both principal and agent— upon the corporation owning, or person or corporation occupying any railroad within this State.—*Gardner v. Smith,* *7 Mich., 410; Clement v. Canfield, 28 Vt., 303; The C., St. Paul & Fond du Lac R. R. v. McCarty, 20 Ill., 385.* ·

II. No question of negligence on the part of defendant in error can arise in the ordinary use of the land when his horse was lawfully at pasture in a close alongside of defendants' road.—*10 Fost., 188.* Plaintiff in error neglected its statutory duty at its peril.—*8 Barb., 358; 3 Ker., 42; 2 E. L. and Eq., 294.* The refusal to charge as requested in 3d, and the charge as given in 4th assignment, were therefore correct.

III. August 12, 1868, the horse was killed. Section 1987 C. L., as amended in 1867, was then in force, giving *double* damages for injury arising from neglect to erect and maintain fences. The law in force when the injury was done fixed the measure of the plaintiff's right— and when the injury was done that right was complete and vested.—*Dash v. Van Kleeck, 7 Johns., 477; Watkins v. Haight, 18 Johns., 138; Palmer v. Conley, 4 Denio, 374; The People ex rel. Salt Co., v. State Auditors, 9 Mich., 327.*

It is a sound rule of construction to give a statute a prospective operation only, unless its terms show a legisla-

tive intent that it should have retrospective effect.—*Cooley's Cons. Lim., 370.* The courts refuse to give statutes a retroactive construction unless the intention is so clear and positive as by no possibility to admit of any other construction.—*Sedgwick on Stat. and Const. Laws, 193.* Statutes affecting remedies and proceedings pending at the time of their enactment, are to be exempted from their operation unless a contrary intent appears.—*Trist v. Carbenas, 18 Abb. Pr., 143.* To hold otherwise, would defeat vested rights and punish the innocent.

GRAVES, J.

On the 12th of August, 1868, a horse belonging to the defendant in error was run over and killed by an engine of the Flint & Pere Marquette Company on the road of the plaintiffs in error, and this suit was brought by Austin to recover for the injury. On the 22d of June, 1869, a verdict was given in his favor for $212.04, and on the 9th of October thereafter, the Court, on his motion, awarded judgment for double that sum. While it appears by the bill of exceptions that the plaintiffs in error owned the road, it also appears that under a contract between them and certain officers and stockholders of the Flint & Pere Marquette Company, and when the road was only in part constructed, the latter company entered and finished it, and exclusively operated it, and that the horse was killed by the engine of that company, while using the road under such contract.

The first question arises on an objection by plaintiffs in error, that under the 43d section of the general railroad law, as amended in 1867, they could not be held liable on the ground that the Flint & Pere Marquette Company were not their "agents," within the meaning of the statute. We have to inquire therefore whether, in view of the facts

of this case, a proper construction of that law would make the word " agents," as there used, comprehend the Flint & Pere Marquette Company.

This section, before its amendment in 1867, was, and also since the repeal of that amendment, is identical with section 44 of the general railroad law of New York, and similar in its essential features and import to statutes relating to the same subject in several of the states. And whenever the courts have proceeded to expound such enactments, they have refused to confine their operation within the smallest limits permitted by the phraseology employed, but have given them an enlarged construction, and one calculated to advance the supposed object. The Court of Appeals in New York, in deciding a recent case under their statute, stated very clearly the rule to be observed. They said:—" The passage of this act being induced by public considerations, and its purpose being to *protect the traveling public and the owners of domestic animals along the line of road,* it should receive a liberal construction to effectuate the benign purpose of its provisions."—*Tracy v. The Troy and Boston R. R. Co, 38 N. Y., 433, 437.*

The mode of interpretation here expressly asserted has been constantly assumed as the true one, and numerous cases might be cited by way of illustration. The two following have a direct bearing upon the point.

In *Suydam v. Moore & Losee, 8 Barb., 358,* it was decided that a person hired by the engineer, and having charge under him of the brake, was to be considered an agent of the company, under the New York law.

In a case decided in this Court in 1859, where one Gardner, a contractor with a company for track grading, was prosecuted for damages occasioned by the loss of a flock of sheep for want of a fence along the line of the road, and in which the point was made that the defendant did

not possess the character of "agent," as intended by the statute, the Court said:—"We think Gardner was an agent within the letter and spirit of the act; it was evidently intended to embrace under the denomination of agent, every one in the employment of the company. The word is to be taken in an enlarged sense to include those who exercise the power of the company upon or over the road, as well as those acting as engineers, or in any other subordinate capacity, and who may be active in, or connected with the commission of the injury. Thus in *Clement v. Canfield, 28 Vt., 303*, a lessee of a railroad, in possession, was held to be an agent within the meaning of a like statute, and in the *Chicago, St. Paul & Fond du Lac R. R. v. McCarthy, 20 Ill. R., 385*, a contractor was held to be an agent under the statute of Illinois."—*Gardner v. Smith, 7 Mich., 410*. The amendment of 1867 not affecting the point here examined, it is believed that the doctrine of the foregoing cases is decisive against the plaintiffs in error. In the present case the road of plaintiffs in error was finished, stocked, and worked by the Flint & Pere Marquette Company, at the instance of the former, and for their benefit, under regulations set forth in the agreement contained in the bill of exceptions. It was by the express authority and permission of the plaintiffs in error that the Flint & Pere Marquette Company were running over the road when the horse was killed; and if the loss had occurred by means of an engine of the latter engaged in finishing the road, under the agreement, the case would have plainly fallen under the rule laid down in *Gardner v. Smith*.

The circumstance, that the engine at that time was in use for traffic, under the agreement, instead of being employed in construction, cannot change the result. The principle must be the same whether the Flint & Pere

Marquette Company were, as contractors, running over the road to finish it, or to carry freight, so long as the running was done on the same footing, and under the same arrangement and authority.

Section 43, as it originally stood in the general law, cast the burden of maintaining a fence upon the corporation *formed under the statute*, but by the amendment of 1867 the Legislature seem to have intended to impose the duty upon the owners and occupants respectively, as well as on the company first organized, and without confining it to either.

Neither the phraseology nor manifest object or spirit of the amendment of 1867 will warrant the supposition that the Legislature designed to limit the duty to an occupant or owner when these characters should be disunited. The strong necessity on public and private grounds for the protection afforded by a fence being perceived, and experience having shown that the shifts and changes in railroad ownership, occupancy and management might make it difficult to secure it, it was deemed important to spread the duty of fencing on so many shoulders as to make evasion an impossibility.

The duty was therefore cast upon *every* party within the description, and not merely on some one to the exclusion of others. In strict accordance with the same general design, and in amplification of the remedial purpose of the statute, it was provided that the making or maintaining a fence being omitted, any of the parties subjected to the duty of making and maintaining it and doing the suggested damage on the road, and any agents of such parties doing such damage, should be liable.

The fact, that the agent committing the act was made liable as well as the principal, is palpable, and this is a complete answer to the argument that the law intended to

confine the liability to a single party. Indeed, the object of the provision, and the language used, strongly favor the conclusion, not only that the duty to maintain a fence may rest on several different parties at the same time, but that each of said parties, in fact, implicated in the act causing damage will be involved in liability on account of that act.

The circumstance, therefore, that the Flint & Pere Marquette Company were under a duty to maintain the fence, and may have been liable under the statute for the injury complained of, cannot be considered as excluding the existence of the like duty and the like liability on the part of the plaintiffs in error. As owners of the road, the latter were bound to maintain the fence, and they would be liable for the damage done by their agents in case the fence should not be maintained. If these agents should also be "occupants" of the road, they would likewise be liable in their character of agents and in that of occupants, but this could not exonerate the principal, nor would the fact that a party was an "occupant" of the road preclude his being an "agent" of the owner in the statutory sense.

It appeared on the trial that the horse of Austin, together with a horse belonging to Mr. McKay, were in a field owned by Mr. English; that this field adjoined the railroad and had been fenced; that McKay occupied the land as tenant; that the Flint & Pere Marquette Company had shortly before the accident put in a pair of bars for the accommodation of this field, and that McKay had, within a day or two, hauled hay through there; that at 7 o'clock in the afternoon of the 12th of August the bars were up; that about an hour afterwards the two horses were encountered on the track near the bars by the engine and killed; that the horses were tracked to the bars, which were then found to be down at one end; and that the

cause of the bars being down seemed to be that one of the upright boards holding them in place had been pushed off. It also appeared that both horses were quiet and orderly, and that they passed through the bars to the place where they were struck.

The evidence was conflicting as to the height and strength of the bars, that for the defendant in error tending to show that they were less than four feet high, and that the upright strips which were meant to secure the ends of the bars were only nailed on to the posts with three eight or ten-penny nails, and could be pushed off by horses in rubbing against the bars; and that for the plaintiff in error tending to prove that the bars were more than four feet high, and that the upright pieces were strongly nailed on with at least twelve nails of twelve-penny size, and a spike in each.

Upon these facts the counsel for the company requested the following charge: "The bars having been put in for the accommodation of the farm crossing, it was the duty of the person in charge of the farm to keep the bars up, and if they were out of *repair, it was his duty to call the attention of the defendant, or its servants or officers, to that fact, and if he failed to keep up such bars, or to give such notice, he was guilty of negligence which will defeat a recovery for damages resulting therefrom." But the Court, declining to give such instruction, stated and charged as follows: "That request I cannot comply with. It (the request) seems to devolve upon the person in charge of the farm to exercise a supervision, which is a part of the duty of keeping a fence in repair. It supposes that the person in charge of the farm, if he found the bars down, must put them up; that duty devolves on the defendant. But if the plaintiff should let the bars down himself, it would be his duty to put them up as well a

they were before he let them down, and if the defect in the fence or in the bars arose from ill usage by the plaintiff or by McKay, who had charge of plaintiff's horse, and the defect did not come to the knowledge of the defendant, the plaintiff cannot recover. If a defect arose after the bars were originally made, otherwise than by ill usage from the plaintiff or from McKay, it would not be the duty of McKay, or the person in charge of the farm, to give any notice about it; the defendant was bound to take notice if the fence got out of repair on account of ordinary wear or the ordinary effect of the elements; it was the duty of the defendant to take notice of it."

It is now insisted that it was the legal duty of McKay, who was in charge of the farm, to put up the bars whenever he found them down by whatever cause, and also to repair them whenever he found them out of repair, without reference to what may have produced their bad condition, and that therefore the Court erred in refusing the foregoing request which denied to Austin any legal redress in case McKay failed in such duty; and it is likewise claimed that the Court erred in the charge given in response to the request.

It is a sufficient reply to this objection that the facts, assumed by the request and implied by the objection, are not found in the record. There is no evidence that McKay or any one else found the bars down between 7 o'clock, when they were in place, and the time when the horse was killed, nor any evidence that the bars were found out of repair at any time prior to the accident. The evidence bearing upon the condition of the bars, with a single unimportant exception, related to their height and mode of construction and not to their state of repair. The testimony that a single bar had a piece split from it and apparently from having been run over, was, under all the

circumstances, destitute of weight to show that the bars were out of repair. It does not appear to have had any connection whatever with the cause of the bars being down, or in itself to have been a defect leading in any manner or degree to the escape of the horse.

But it is unnecessary to rest upon the irrelevancy of the request and objection. The charge given upon the points raised was quite as favorable to the plaintiffs in error as they were entitled to.

It had been shown without contradiction that both horses were quiet and orderly, and this circumstance excludes any inference that the bars were subjected to any improper strain by them. Such being the case, the evidence in the record leaves it necessarily to be implied that the bars were weak and insufficient. No other explanation of what happened is admissible upon the evidence. It is true that conjecture might suggest another explanation, but conjecture is not a basis for judicial reasoning or deduction.

The duty imposed by the statute to maintain a fence was peremptory, and if it should be admitted that an inevitable and sudden destruction or injury would excuse compliance with the mandate for such reasonable time as should be necessary for restoration or repair, still there is nothing in the record tending to show any such destruction or injury.

Under the charge given, the jury must have found, that if the defendant in error let down the bars, he put them up as well as they were before he let them down, and there does not appear to have been any evidence tending to show that either McKay or defendant in error, by ill usage, caused the defect by which the horses escaped. Whether the fence and bars, when up, were of proper height, was a matter of no practical consequence, since it was clearly proved, and not disputed, that the escape from the field was

solely owing to the condition and not to the height of the bars. The statute nowhere specifically defines the strength which the fence must possess. The section before referred to declares that it must be of the "height and strength of a division fence required by law," and the only enactment on the subject of partition or division fences does not prescribe how strong they must be built. It declares that "all fences four and a half feet high, *and in good repair, consisting of rails, timber, boards*, or *stone walls*, or *any combinations thereof*, and all brooks, rivers, ponds, creeks, ditches, and hedges, or other things which shall be considered equivalent thereto in the judgment of the fence-viewers within whose jurisdiction the same may be, *shall be deemed legal and sufficient fences.*"—§ *1, Ch. 14, Com. L.*

A "*fence*" four and a half feet high, constructed of timber and boards and being in repair, would, according to this statute, be a lawful fence.

But there may be an erection of timber and boards of the height of four and a half feet which would furnish no protection whatever as a fence when in perfect repair, and hence a literal reading of this provision would lead to a result which would defeat its purpose. The statute must have a reasonable construction. The word "fence," as employed here, must be construed as including a mode of construction which will give the fabric when completed such reasonable strength as to confine or turn the animals usually restrained by fences in this country.

The bars in question were combined of "boards and timber," and it was the duty of the company to keep them in such a state of repair as to answer the purpose of a fence, and at the same time to serve as a place of passage.

I think the provision as to fences along railroads was not intended to require the interposition of fence-viewers.

The purpose was to require the owners and occupants of railroads to maintain fences, which, when built of the specified materials, should be four and a half feet high and of the strength just mentioned, and when consisting of hedges, ditches, etc., to be equivalent to the "fence" made of the other materials. But if the contrary view should be deemed the right one, the result in this case would be the same. The first paragraph of the section regulating fences gives the standard and provides for an award by fence-viewers, not upon that, but upon whether the brook, river, pond, creek, ditch, hedge or other thing relied on as a substitute, is equivalent thereto. As the bars were of the materials mentioned in the first paragraph and not something else proposed as a substitute, there was no question to be settled by fence-viewers.

The remaining question is attended with more difficulty.

The act of 1869, which was passed before the verdict, and became operative after it, but *before judgment*, struck from the amended section 43 the word "double," leaving a liability for single instead of double damages, and the plaintiffs in error insist that this amendment cut off all right to a judgment for more than single damages. They claim that the act of 1867, in allowing more than the single damages, was exclusively punitory, and vested no right in the defendant in error, which the Legislature, before judgment, could not take away.

On the other hand, it is argued for the defendant in error that the law as it stood when the injury was done, fixed the measure of his right, and that the moment the damage was done, he acquired an inviolable right to recover not merely all his damages, but double that amount, and that it is not to be supposed that the Legislature intended, by the repealing act of 1869, to affect the measure of redress in a pending action.

The Constitution of this state contains no provision in terms against the passage of retrospective laws, or laws affecting rights and remedies in pending proceedings, and such statutes are not necessarily invalid. The purposes of justice, and the welfare of the community, may be occasionally advanced by such enactments, and the history of our legislation does not fail to disclose instances of this kind. The validity of such statutes must depend upon the nature of the objects to which they relate, or the consequences which attend their application in particular cases; and unless they bear injuriously upon some private or vested right, unless they fall without the domain of general legislative power, or violate some constitutional interdict, the courts have no authority to pronounce against them.

As experience, however, has shown that laws operating upon past transactions and upon pending proceedings, when within the competency of the Legislature, are extremely liable to disturb the course of justice and prejudice the interests of those who have acted upon the faith of legal conditions pre-existing, it is an established maxim to construe statutes as having only a prospective operation unless a contrary intent is plainly indicated.

The act of 1869 was an unqualified repeal of the phrase introduced by the act of 1867 giving double damages, and there is no ground for holding that the Legislature meant to except pending cases from its operation. It must therefore be considered as applying to the case at bar. It cannot be adjudged invalid simply because it was framed to operate upon pre-existing rights and pending cases. Can it be held inoperative against the claim of defendant in error upon any other ground? He maintains that his right to a judgment for double the whole damages found by the jury under the amendment of 1867 was a vested right which the subsequent enactment could not take away.

21 MICH.—Z².

He had instituted his suit under the act as amended in 1867, and had obtained a verdict for single damages when the repeal of the clause allowing such damages to be doubled became operative.

Beyond all doubt his right to a judgment for single damages was secure against legislative attack, and no attempt was made to impair the right to such damages. The statute was aimed solely against the power to recover for the additional sum. What was his right to that additional sum? The original section entitled him to "*all damages;*" the amendment of 1867 assumed to authorize a recovery for "double all damages," and the repealing act of 1869 limited the right of recovery to "all damages," as it formerly stood. No authority exists at common law for increasing the recovery by multiplying the whole damages found by the jury, and it is not clearly perceived upon what principle the Legislature can be justified in declaring that for an injury of the kind in question, a party shall be entitled to "double all the damages."

The power to multiply the sum of the whole damages by two implies the power to multiply it by a hundred, and the excess, be it more or less, is so much beyond all the damages, taken from one party and given to another.

This, of course, cannot be done to make the plaintiff whole, but must be to accomplish some other object. Whatever that object, the process, as between the parties, eventuates in bestowing a boon upon the one at the expense of the other. For, as between man and man in these cases, having no element of wantonness, willfulness, or malice, the claims of moral justice are satisfied when the party at fault has paid all the damages, actual or presumed. Without assuming, however, to call in question the validity of that portion of the act of 1867 which authorized the whole damage to be doubled, the real character of the provision

may justly be considered when a party claims that the Legislature could not prevent his recovering the extra amount. The claim of defendant in error to exact from the company and appropriate to himself a sum of money above all his damages, was not a right resting upon any principle of natural equity, or upon any idea of abstract justice, as between the parties, but a claim based solely on a legislative *dictum*. The allowance of "all the damages" satisfied the justice of the claim as between the parties, and the provision giving more must have been dictated by legislative views of public policy.

It is impossible to regard the excess above single damages, allowed by the act of 1867, in any other light than in the nature of a penalty, and a penalty not resting in contract, or given in lieu of damages, or as the measure of redress due to the complaining party, but imposed by legislative power for the purpose of punishment.—*Merchants' Bank v. Bliss, 13 Abbott's P. R., 225;* s. c. *21 How. P. R., 365.*

The language and spirit of the act exclude the supposition that the Legislature intended compensation or any thing of the nature of recompense to the injured party in allowing the extra amount, since the single damages provided for were "all the damages done," and if, as single damages, the party obtained "all the damages," his recovery beyond that must embrace something not strictly damages at all. The name given, therefore, to this excess by the statute cannot alter its intrinsic character and transform a penalty for punishment into a mere recompense; neither can the circumstance that the amount above the whole damages, when recovered, would pass to the plaintiff and not to the public, alter its nature and convert it into a private personal claim absolutely inextinguishable by repeal before judgment.—See *Butler v. Palmer, 1 Hill, 324,* and

cases cited; *Engle v. Shurts, 1 Mich., 150 ; Seymour v. McCormick, 16 How., 480, 488, 489.*

In the case last cited it was considered that when Congress, by one patent act, made an infringer liable to the patentee for *three times* the *price* for which the patentee had usually sold or licensed the use of the invention, and by a subsequent act to *three times* the *actual damages* sustained by the *patentee*, the excess above the price of the license in the first case, and above the actual damages in the second, was of the nature of a *penalty and intended as a punishment* of the infringer, notwithstanding it was to go to the *patentee* and not to the government. And in alluding to the nature of the provision in the first case, the Court said:—"Here the price of the license is assumed to be a just measure of single damages, and the forfeiture, by way of *penalty,* is fixed at treble that sum;" and when adverting to the change wrought by the second act, and the nature of the provision itself, it was further declared in substance that there was no good reason why the taking of a man's property, in an invention, when not wantonly or maliciously done, should be *trebly punished,* while the measure of damages as to the other property, taken without wantonness or malice, is single and actual damages.

If we test the amendment of 1867, and the act of 1869 which repealed it, by the principles supposed to distinguish vested rights of property and secure them against encroachment, we shall find as substantial reasons for maintaining that the first act, as sought to be applied to the plaintiffs in error, invaded their vested rights of property, as can be discovered for contending that the repealing act was an infringement of the vested rights of property of the defendant in error. The effect of the amendment of 1867 was to allow the defendant in error to draw an amount beyond all his damages from the property of the plaintiffs

in error, and the effect of the repealing act was to prevent that consequence.

When a party, as in this case, avers that a statute has invested him with a right against another in the nature of a personal charge, which a repeal of the statute before judgment cannot impair, he takes it upon himself to show that the right was vitalized by some personal equity underlying the law, or arising upon it.

The claim of the defendant in error appears to have no such element to support it. It rests upon the single fact that the Legislature, by the passage subsequently repealed, authorized judgment in double the whole damages.

Without pursuing the subject further, I think it may be safely maintained that the Legislature, in passing the act of 1867, assumed that the whole damages, without addition, would be a complete satisfaction to the plaintiff, but in the exercise of legislative discretion, acting upon grounds of public policy, superadded the increased liability to punish the defendants, and not merely to benefit the plaintiff; that notwithstanding the method adopted involved the appropriation of the penalty by the plaintiff, the provision did not give rise to a right to such penalty in the destined donee superior to the power of the Legislature; and that the amendment of 1867, in declaring a liability in a sum beyond the measure of full reparation, assumed to impose a duty upon the party made liable to pay such extra sum, but did not assume to confer on the other party an irrepealable right to obtain judgment for that precise sum.

Before judgment, the power of the Legislature over the extra liability could be no less, and the right of the plaintiff below no greater, than would have been the case if the excess had been expressly called a forfeiture, and been required to be paid over to the public on collection. And

if such had been the regulation, the repealing act must have cut off the power to recover the sum given exclusively for punishment, and deprived the Court of jurisdiction to award judgment for it.—See *Lewis v. Foster, 1 N. H., 61; Welch v. Wadsworth, 30 Conn. R., 149; Oriental Bank v. Freeze, 6 Shepley, 109; Hollingsworth v. Virginia, 3 Dallas, 378; Hunt and wife v. Jennings, 5 Blackf., 195; Washburn v. Franklin, 35 Barb., 599; Cooley on Const. Lim., 383.*

I think the judgment of the Court below, as to all damages above the amount found and returned by the jury, should be reversed, but in all other respects be affirmed, and that the plaintiffs in error should recover their costs in this Court.

The other Justices concurred.