Atchison & Nebraska R. R. Co. v. Baty.

THE ATCHISON & NEBRASKA R. R. CO., PLAINTIFF IN ERROR, v. EMELINE BATY, DEFENDANT IN ERROR.

1. **Constitutional Law:** LEGISLATIVE POWER. The legislative authority cannot reach the life, liberty, and property of the individual, except when he is convicted of crime, or when the sacrifice of his property is demanded by a just regard for the public welfare.

2. ————— : —————. The rights of every individual must stand or fall by the same general law that governs every member of the body politic in the land, under similar circumstances, and therefore a partial law which proposes to affect or destroy the rights of particular persons, or a particular class of persons, is not the law of the land.

3. ————— : CONSTRUCTION OF STATUTE. That part of the statute of June 22, 1867, which gives to the owner of live stock "double the value" of his property accidentally injured or destroyed on a railroad track is void.

ACTION to recover under section ten, Gen. Stat., 201, double the value of certain hogs of Emeline Baty, killed by the cars of the Atchison & Nebraska R. R. Co. Verdict and judgment below in favor of said Emeline Baty, and the railroad company bring the cause here by petition in error.

*S. B. Galey*, for plaintiff in error.

The judgment of the district court rendered in this cause ought to be reversed, for the reason that the statute allowing the owner of animals killed or injured upon a railroad track to recover double the value thereof upon failure of the company to pay the value claimed within thirty days after notice, is unconstitutional and void. See section two of an act, entitled "An act to define the duties and liabilities of railroad companies," page 201 of the General Statutes of Nebraska. The constitutional provision with which this section is deemed to be in conflict, is found under the title of "Education," and reads as follows:

"SEC. 5. All fines, penalties, and license moneys arising under the general laws of the state shall belong and be paid over to the counties respectively where the same may be levied or imposed; and all fines, penalties, and license moneys arising under the rules, by-laws, or ordinances of cities, villages, towns, precincts, or other municipal subdivisions less than a county, shall belong and be paid over to the same respectively. All such fines, penalties, and license moneys shall be appropriated exclusively to the use and support of common schools in the respective subdivisions where the same may accrue."

The excess over the actual value of the animal injured or killed in cases like this is a penalty "imposed by legislative power for the purpose of punishment." *Bay City & E. Sag. R. R. Co. v. Austin*, 21 Mich., 410.

There is no principle upon which the legislature can be justified in declaring that, because a railroad company fails to pay the value of an animal killed or injured on a railroad track within thirty days after notice, the company shall therefore pay double the value, either to

the owner or the school fund. The penalty is not imposed for failing to fence the road, nor for killing or injuring the animal, because the road was not fenced; nor because the killing or injury was negligent, willful, or malicious, but simply because the company fails to pay within thirty days after notice. Such an act is not within legislative power. It is an attempt to exercise an arbitrary power, making a rule regulating the payment of debts by railroad companies different from that prescribed for the payment of debts by others. Class legislation and special rules of government are repugnant to our constitution. All laws regulating the collection of debts should be general in their nature and application. *Walley's heirs v. Kennedy*, 2 Yerg., 554. Cooley Const. Lim., 392, 393.

Again, this is a species of legislation which seeks to take private property for private use, which is forbidden by all governments whether written in their constitutions or not. The learned judge in the Michigan case above cited says, that " the power to multiply the sum of the whole damages by two, implies the power to multiply it by a hundred, and the excess, be it more or less, is so much beyond all the damages taken from one party and given to another."

It is a fundamental right retained by the people as much so as though it had been expressed in our constitution that the private property of one person cannot be taken by the legislature and given to another under any pretense other than that it is for the public use, and then only upon giving just compensation. Cooley's Const. Lim., 175. *People v. Morris*, 13 Wend., 328.

*S. P. Davidson*, for defendant in error, cited *Tredway v. The S. C. & St. P. R. R.*, 43 Iowa, 527.

GANTT, J.

In this cause one question only is raised for determination by this court, and that is, whether that part of the statute of June 22d, 1867, which gives to the owner of live stock "double the value of his property injured, killed, or destroyed" on a railroad track, in case the same is not paid within thirty days after demand therefor is made upon the company, is "the law of the land." This question is one of importance. It involves an inquiry into the individual rights of property—the inquiry whether the title to the same can be divested without the assent of the owner, and the question of legislative power over such property. The term *right* in civil society is defined to mean that which a man is entitled to have, or to do, or to receive from others within the limits prescribed by law.

But what is the law in regard to private property? In a historical examination of the question we find that man in the rudest state of nature was not without some notions of exclusive property, and that jurists in every age, as civilization advanced, have maintained that what a man has obtained by the honest exertion of his own mind, or his own hand, is by natural right his own property. Indeed, it may be said, that the protection of this right is the main security to the enjoyment of life.

Burlamaqui (Politic c. 3, § 15) defines natural liberty as "the right which nature gives to all mankind of disposing of their persons and property after the manner they may judge most consonant to their happiness, on condition of their acting within the limits of the law of nature, and so as not to interfere with an equal exercise of the same rights by other men;" and therefore it has been justly said, that "absolute rights of individuals may be resolved into the right of personal security—the

Atchison & Nebraska R. R. Co. v. Baty.

right of personal liberty—and the right to acquire and enjoy property. These rights have been justly considered and frequently declared by the people of this country to be natural, inherent, and unalienable." Potter's Dwarris, ch. 13. p. 429.

Cooley (Con. Lim., 358) says, that "the right of private property is a sacred right," not introduced as the result of concessions, constitutional compacts, etc., but it is a fundamental law.

Then if experience can be taken as the guide, and expediency as the test, in solving the problem of government, it may be laid down as an axiom, that in every advanced step of mankind from the rudest state of nature to the more polished and refined civilization, the one leading purpose of the functions of government, as applied in each step to a higher civilization, was to secure, in greater degree, the natural rights of each individual in the social compact; and, therefore, in all the changes of government, whether by constitution or otherwise, this ancient law of individual right was the sacred shield of protection to life, liberty, and property. It is a fundamental principle lying beneath and behind all edicts, constitutions, and statutory law, and has become an established maxim in the doctrine of the common law. Webster says that "written constitutions sanctify and confirm great principles, but the latter are prior in existence to the former." 2 Webster's Works, 392. Hence, it may be said with great propriety, that a constitution "measures the powers of the rulers, but it does not measure the rights of the governed;" that it is not the origin of rights, nor the fountain of law—but it is the "framework of the political government, and necessarily based upon the pre-existing condition of laws, rights, habits, and modes of thought." Cooley Con. Lim., 37. *The People v. Hurlbut*, 24 Mich., 107.

The design of the constitution, then, is to protect the absolute rights of individuals, as well as to establish the framework of the political government, and define its limitations—wherefore it is called the supreme law of the land.    It is, nevertheless, true that under the police regulations of civil society, property may be regulated so as to protect others from injury in the use of it. The maxim is, *sic utere tuo ut alienum non lœdas*, and therefore however absolute and unqualified may be the title of the owner of private property, he holds it under the implied liability that his use of it shall not be injurious to others, nor to the rights of the community; but this does not infringe the right of or title to property.

This common law right of property is secured by our constitution.    It declares that "no person shall be deprived of life, liberty, or property, without due process of law."    The terms "due process of law" and "the law of the land"—one or the other of which is found in all constitutions of the states—are said to mean the same thing; and it is quite clear that they are indifferently used in constitutions for the same purpose.    They are said to refer to a pre-existing rule of conduct, and designed to exclude arbitrary power from every branch of the government.  *State v. Doherty*, 60 Me., 509.  *Norman v. Heist*, 5 W.and S., 171.  *The State v. Simons*, 2 Spears, 767.  Hence, these terms do not mean merely a legislative enactment; for, "if they did, every restriction upon the legislative authority would be at once abrogated.    For what more can the citizen suffer than to be taken, imprisoned, disseized of his freehold, liberties and privileges; be outlawed, exiled, and destroyed; *and be deprived of his property*, his liberty, and his life, without crime.    Yet all this he may suffer, if an act of the assembly, simply denouncing these penalties upon particular persons, or a particular class of persons be in

itself the law of the land within the sense of the constitution." *Hoke v. Henderson*, 2 Dev., 15. Webster interprets these terms to mean "that every citizen shall hold life, liberty, property, and immunities under the protection of the *general rules* which govern society. Everything which may pass under the form of an enactment is not therefore to be considered as the law of the land;" and he says, if this were so, "acts directly transferring one man's estate to another, legislative judgments, decrees and forfeitures in every possible form would be the law of the land. There would be no general permanent law for the courts to administer, or even to live under. The administration of justice would be an empty form—an idle ceremony. Judges would sit to execute legislative judgments and decrees, and not to declare the law, or administer the justice of the country." 5 Webster's Works, 487. *State v. Doherty*, 60 Me., 509. *James' Heirs v. Perry*, 11 Mass., 404. *Lane v. Dorman*, 3 Scam., 240–1. *Commonwealth v. Bryne*, 20 Gratt., 165. *Bank of Columbia v. Okeley*, 4 Wheat, 243.

It is, however, true that, subject to the qualified negative of the governor, the legislature possesses all the legislative power of the state; but as it is said in *Taylor v. Porter*, 4 Hill, 144, "under our system of government the legislature is not supreme. It is only one of the organs of absolute sovereignty which resides in the whole body of the people," and, therefore, as the "security of life, liberty, and property lay at the foundation of the civil compact, to say that the grant of legislative power included the right to attack private property would be equivalent to saying that the people had delegated to their servants the power of defeating one of the great ends for which government was established." Smith's Const. Law, 484. This one great end of government is the protection of the absolute right of individ-

uals—the life, liberty, and property of each citizen of the state.

Now, from a review of the law in respect to private property and the limitations of the constitution, it seems clear, that when a legislative act interferes with the title to the property of the citizen, or with his enjoyment and disposal of such property, and such act is called in question as unconstitutional and void, its authority and binding force must be tested by the fundamental principles in respect to the rights of private property, the constitutional limitations and the maxims of the common law, which constitute the basis of our system of laws; and it also seems clear that, from the earliest history of civil society, down through all ages, one of the leading functions of government has been to protect life, liberty, and private property of the individual as sacred. Then, upon what principles or theory can these absolute rights of individuals be infringed or affected by legislative act, or the title to private property be divested and be appropriated by the government without the assent of the owner?" The answer to the question is that, when demanded by the public exigencies, private property may be taken, either by right of eminent domain or by way of taxation, and this modification of the law of natural right becomes an absolute necessity in the maintenance and administration of the government; but in exchange for this sacrifice of property, the individual receives the protection and security guaranteed to him by the government; and when property is taken by right of eminent domain, it is said to be " a universal and permanent proposition in every well-regulated and properly administered government, whether embodied in a constitution or not, that private property cannot be taken for strictly private purposes at all, nor for public without just compensation." *The People v.*

*Morris*, 13 Wend., 328. And, again, in the adminis tration of criminal jurisprudence, the government takes private property by way of fine or forfeiture, upon the conviction of certain crimes, and this exception to the general rule seems to rest rather upon the principle that the penalty which must otherwise have fallen upon the person is redeemed or ransomed by this pecuniary fine, according to the ancient maxim, *qui non habet in œre luat in corpore*, and therefore in the superior courts of England fines were frequently denominated ransoms. *Broom and Hadley's Com.*, 630.

The above seems to be the only instances in which the government justly has the right to divest title to the property of the citizen, and therefore it may be stated as an established maxim in the polity of the state, that the legislative authority cannot reach the life, liberty, or property of the individual, except when he is convicted of crime, or when the sacrifice of his property is demanded by a just regard of the public welfare. *Taylor v. Porter*, 4 Hill, 745. *Wilkinson v. Leland*, 2 Peters, 658.

Again, it seems clear that the statute in question is incompatible with another provision of the constitution. It will not be pretended that the act was intended to define a statutory criminal offense. Still, it is impossible to regard the excess beyond the value of the property in any other light than a penalty, not resting in contract, but a penalty or fine for the purpose of punishment; but this penalty or fine is by the statute given to the party claiming damage for the accidental loss of his property, and hence the act must come in conflict with that provision of the constitution which declares that "all fines and penalties," etc., "shall be appropriated exclusively to the use and support of common schools."

The statute seems to be obnoxious to another just rule in the administrative policy of the government. It may be considered a well-settled rule in respect to the operation of the laws, that corporate companies and natural persons are placed precisely upon the same ground; and "this is the true ground, and the only one upon which equal rights and just liabilities and duties can be fairly based." Now the statute in question is partial. It applies to one class only; but it is said that the lawmakers "are to govern by promulgated, established laws, not to be varied in particular cases, but to have one rule for the rich and poor, for the favorite at court and the countryman at plough," and this rule is said to be "a maxim in constitutional law, and by it we may test the authority and binding force of legislative enactments." Cooley Const. Lim., 392. In *Walley's Heirs v. Kennedy*, 2 Yerg., 554, it is held that "the rights of every individual must stand or fall by the same rule or law that governs every member of the body politic, or land, under similar circumstances; and every private or partial law which directly proposes to destroy or affect individual rights, or does the same thing by affording remedies leading to similar consequences, is unconstitutional and void." Hence, "that is not legislation which prescribes a rule contrary to the general law, and orders it to be enforced. Such power assimilates itself more closely to despotic rule than any other attribute of government." *Ervine's Appeal*, 16 Pa. St., 266.

If, however, the legislature has authority by enactment to declare that, for an injury of the kind in question the injured party shall be entitled to receive "double the value" of the property injured, then, does not the authority imply the power in the legislature to make it a hundred times the value of the property; and the

excess beyond the damages sustained, whatever it may be, is so much property taken from one person and given to another. If this legislative power exists in respect to the case under consideration, why shall it not on the same principle apply to simple debt, and therefore, if upon demand by the creditor the debtor fails to pay within a certain time, he may by legislative decree be compelled to pay double, treble, or a hundred times the amount of the debt, according as the legislature may decree by legislative enactment. And whatever the object of such legislation may be, it eventuates in a de-cree taking property from one man and giving it to another; but such legislation is repugnant to the funda-mental principles of individual rights, the maxims of the common law, and the constitutional limitations, and therefore it cannot be "the law of the land." *Bay City and Sag. R. R. Co. v. Austin,* 21 Mich., 401. *Lewis v. Webb,* 3 Greenleaf, 326, 330. *Holden v. James.* 11 Mass., 396. *James v. Reynolds,* 2 Texas, 251.

It may be observed in conclusion that, although the inquiry whether a legislative act is unconstitutional as-sumes an importance from the fact that it is not only a matter of delicacy, but also because it is an inquiry into the boundary lines of the power given to a separate de-partment of the government, yet, "where it is clear that the legislature has transcended its authority, it is imperatively required of the courts" to maintain the paramount authority of law; and after a careful investi-gation of the question involved in the inquiry first pro-pounded, it seems clear that the statute in question is repugnant to the fundamental principles in respect to individual rights, the limitations and guarantees of the constitution, and the maxims of the common law, and therefore the judgment of the court below must be re-versed, and the cause remanded for a new trial.

REVERSED AND REMANDED.