Gulf, Colorado & Santa Fe Railway Company v.
Thomas Dwyer.

No. 2623.

**1. Interstate Commerce—Power of State.**—The following propositions we deem settled upon interstate commerce regulations:

1. A State can make no law regulating the rate of freight for the carriage of goods between that State and another State, although the regulation be construed as applying to so much of the line of transit as lies within its borders.

2. It can make no law which imposes, either directly or indirectly, a burden by way of taxation upon interstate commerce.

3. It may establish and regulate wharves, bridges, and ferries across the boundaries between the States, in the absence of legislation upon the same subject by Congress, provided no burden other than an ordinary charge for their use be imposed upon the commerce passing over them.

4. In the exercise of their police powers the States may enact laws which, though they may affect commerce between the States, are not to be considered regulations of that commerce within the meaning of the Constitution of the United States.

**2. Statute Construed—Police Power — Penalty on Railway.**—The statute (Laws of Called Session Seventeenth Legislature, p. 35) provides "that any railway company, its officers, agents, or employes, that shall refuse to deliver to the owner, agent, or consignee any freight, goods, wares, and merchandise of any kind or character whatever, upon the payment or tender of payment of the freight charges shown by the bill of lading, the said railway company shall be liable in damages to the owner of said freight, goods, wares, or merchandise to an amount equal to the amount of the freight charges for every day said freight, etc., is held after payment or tender of the charges due, as shown by the bill of lading, to be recovered in any court of competent jurisdiction." This statute was a proper exercise of the police power reserved to the State, and it is therefore valid.

**3. Statutory Duty of Railway Company — Compulsory Act Carries No Consent.**—Our statutes make it obligatory upon any railway company in this State to draw over their road without delay the passengers, merchandise, and cars of every other railway company which may enter and connect with their road. It was therefore error for the court to charge the jury that if the defendant company received the freight from another railway company at a point within the State, such act would constitute an affirmance of the original contract made for the shipment of the freight.

**4. Construction of Statute—Penalty.** — The act (above set out) only applies when the railway company that is sought to be charged in damages has either itself executed the bill of lading, or authorized another company to execute it, or has ratified it by some voluntary act on its part.

**5. Original Waybill as Evidence.** — The original waybill was relevant and competent evidence, it showing that the defendant company on receiving the freight had advanced the full contract price for the entire distance.

**6. Bill of Lading Held by Owner—Demand for Freight of Carrier.**—In an action by the shipper for the penalty for nondelivery of freight upon payment of the freight due as shown by the waybill, it was error for the court to charge that in order to make the demand effectual under the statute the plaintiff (shipper) must at the time have exhibited his bill of lading.

**7. Same.**—It seems however that in case of dispute as to the amount due, and the owner should on request refuse to exhibit his bill of lading, he could not recover the penalty for nondelivery.

Appeal from Washington.    Tried below before Hon. I. B. McFarland.

This suit was instituted February 3, 1885. The petition alleges, in substance, that on November 12, 1884, Zug & Co., acting for the plaintiff, delivered two hundred and fifty kegs of nails at Pittsburg, Pennsylvania, to the Pittsburg, Cincinnati & St. Louis Railway Company, which company then operated a railway from the city of Pittsburg to the city of St. Louis, and which company on the same day executed and delivered to Zug & Co. their certain bill of lading, and thereby agreed and undertook to transport and deliver the nails to the plaintiff in Brenham, and stipulated that the rate of freight for the transportation of said nails from the place of shipment to Brenham, Texas, should not exceed seventy-nine cents per keg; that said company transported the nails part of the distance and delivered the same at some point in the State of Texas to the defendant company, which defendant received the nails and undertook and agreed to carry out the contract of the Pittsburg, Cincinnati & St. Louis Railway according to the terms of the bill of lading; that the defendant transported the nails to Brenham, but refused to deliver the same at Brenham upon the payment of freight at the rate of seventy-nine cents per keg, which amounted to $197.50, but demanded a greater amount of freight thereon, to-wit, $232.50.

The petition claims $500 actual damages for the detention of the nails and statutory damages or penalty, being $197.50, which was the amount of freight as specified in the bill of lading, for each and every day that the nails were detained by the appellant. The bill of lading was attached as an exhibit to the petition, and shows by its terms that the Pittsburg, Cincinnati & St. Louis Railway Company undertook to transport the nails to the end of its own line, and there to deliver them to some carrier whose line might be considered part of the route to the place of destination, it being understood that the liability of that company terminated when the freight was delivered to such connecting line, but it guarantees that the rate of freight for the transportation of the packages from the place of shipment to Brenham, Texas, shall not exceed seventy-nine cents per keg and charges.

The defendant answered by general demurrer, special demurrer, general denial, and specially denied that the bill of lading was executed by its authority, and denied that it undertook and agreed to carry out and complete the contract of the Pittsburg, Cincinnati & St. Louis Railway. It alleged that it received the nails at McGregor from the Texas & St. Louis Railway Company, a common carrier operating a line of railway from the city of Cairo, Illinois, and from the city of St. Louis, Missouri, to the town of McGregor, Texas; that the said Texas & St. Louis Railway Company, acting as the agent of the plaintiff, as the owner of said nails, tendered the same to the defendant for transportation to Brenham; that the defendant paid to the Texas & St. Louis Railway Company the sum of $197.50, which was represented to it by that company as the freight

charges which had accumulated on the shipment from Pittsburg to Mc-
Gregor; that the defendant charged for the transportation of said nails
from McGregor to Brenham its regular rate on such shipments of four-
teen cents per hundred pound, which amounted to the sum of $35, mak-
ing the total amount due the defendant on arrival of the nails in Brenham
$232.50; that the defendant made no special contract for this shipment,
but received the same at McGregor, and undertook to transport the same
to Brenham under its usual tariff rates; that, although the defendant was
under no obligation to do so, it offered to deliver the nails to plaintiff on
his payment of $197.50, the amount specified in the bill of lading, pro-
vided the plaintiff would surrender the bill of lading to defendant and
assign to it his claim under the bill of lading against the Pittsburg, Cin-
cinnati & St. Louis Railway Company, which plaintiff refused to do.
Further, that it was customary for the consignee to surrender his bill of
lading and give a receipt for the amount of overcharge.

The first trial of the case resulted in a judgment for the defendant,
which was reversed by this court on the ground that the custom requiring
the surrender of the bill of lading was invalid.   69 Texas, 707.

On the second trial, March 23, 1888, there was a verdict and judgment
for the plaintiff for $1780.

The statute in question provides in substance that it shall be unlawful
for any railway company in this State to charge and collect, or to endeavor
to charge and collect, a greater sum for transporting freight than is spe-
cified in the bill of lading, and a refusal to deliver the freight on tender
of the amount specified in the bill of lading, makes the company liable
in damages to the owner in an amount equal to the amount of the freight
charges for every day the freight is held after such tender.   Acts 17th
Leg., p. 35.

*J. W. Terry*, for appellant. —1.   If the Act of May 6, 1882, be intended
to apply to interstate shipments, then it is a regulation of interstate com-
merce.   It is, in effect, a regulation of the rate of freight to be charged
on interstate shipments, and is an impediment to the free movement of
commerce between Texas and other States and countries.   It affects directly
articles of commerce, and is not a regulation of the instrumentalities of
commerce only situated wholly within the State, and in so far as it affected ·
interstate shipments it was inoperative and void, although Congress had
not legislated upon the subject.   Railway v. People, 118 U. S., 557;   Com-
missioners v. Railway, 22 S. C., 220;   Hardy v. Railway, 32 Kans., 698;
Railway v. Commissioners, 16 Am. and Eng. Ry. Cases, 1;   Picard v. Pull-
man Co., 117 U. S., 34;   New York v. Miln, 11 Peters, 439;   Groves v.
Slaughter, 15 Pet., 449;   State Freight Tax, 15 Wall., 281;   Hall v. De Cuir,
95 U. S., 485;   Welton v. Missouri, 91 U. S., 485;   Mobile v. Kimball, 102
U. S., 619;   Ferry Co. v. Pennsylvania, 114 U. S., 196.

2.   If the State of Texas ever had any authority to legislate upon the subject, its legislation has been superseded and repealed by the act of Congress known as the interstate commerce bill.   Although States might have, to some extent, the power to pass laws affecting interstate commerce in the absence of any action by Congress, yet, as soon as Congress acts upon the same subject, the State laws are thereby superseded and annulled.

3.   The damages given by the act of the Legislature of May 6, 1882—that is, an amount equal to the amount of the freight charges for every day the freight is held after tender of the payment of the charges due as shown by the bill of lading—is evidently a penalty.   The mere fact that the Legislature used the term damages, instead of penalty, does not change the fact nor render it any less a penalty.   Where an act giving a penalty is repealed before the plaintiff's cause of action is merged into a judgment, it abrogates his right to the penalty.   The act of Congress of February 4, 1887, entitled "An act to regulate commerce," having taken effect before the plaintiff's cause of action was merged into a judgment, the Texas statute was thereby superseded and repealed and the plaintiff's right to the penalty abolished.   Etter v. Railway, 2 Ct. App. C. C., 48; Railway v. Lott, Id., 51.

4.   The defendant was bound by the common law and the statutes of the State of Texas to receive the shipment of nails when tendered to it by the connecting line at McGregor for that purpose, the connecting line being the agent of the owner, and to transport the same for its usual and customary rates from said point to Brenham; and it being usual and customary for a railway company when receiving a shipment from a connecting carrier for transportation to the place of destination to pay to the connecting line the freight and charges accumulated upon the shipment from the point of shipment to the place of delivery to it, the appellant had the right to pay such charges to its connecting line at McGregor, and after the payment of the same had a lien upon the nails for the amount of such freight and charges in addition to its own charges for the transportation of the freight from McGregor to Brenham, and on the arrival of the nails at Brenham had the right to retain the nails until the charges so advanced by it at McGregor and its own charges were paid by the consignee.   The appellant was not bound by the rate of freight mentioned in the bill of lading of the Pittsburg, Cincinnati & St. Louis Railway Company, which bill of lading was issued without its authority, knowledge, or consent, and of which it had no notice at the time it received the nails at McGregor.   Hutch. on Carr., secs. 108, 111, 476, 478; Rev. Stats., arts. 4226, 4227, 4238, 4251-54.

*Bassett, Muse & Muse,* for appellee. — 1.   The law under which the suit was brought is not an attempt on the part of Texas to regulate com-

merce, but is a proper exercise of the police power of the State to regulate the conduct of the railways doing business in the State in their dealings with the citizen.    New York v. Miln, 11 Pet., 102; Railway v. Fuller, 17 Wall., 560; License Cases, 5 How., 504; Foster v. Master and Wardens, 4 Otto, 246; Packet Co. v. Catlettsburg, 15 Otto, 559; Munn v. Illinois, 4 Otto, 113; Osborne v. Mobile, 16 Wall., 479; Woodruff v. Parkam, 8 Wall., 123; Peck v. Railway, 94 U. S., 164, 177; Chicago v. Iowa, 94 U. S., 163; Coal Co. v. Railway, 26 Am. and Eng. Ry. Cases, 45, 46.

2.    But if it be held to be a regulation of commerce at all, it comes within the class in which the States may prescribe rules until Congress assumes to do so.    Packet Co. v. Catlettsburg, 15 Otto, 559; Cooley v. Wardens, 12 How., 299; Gilman v. Philadelphia, 3 Wall., 713; Wilson v. The Blackbird, 2 Pet., 350; Sturges v. Crowninshield, 4 Wheat., 196; Houston v. Moore, 5 Wheat., 1.

3.    No such repugnancy is pointed out between the law in question and the provisions of the act of Congress commonly called the interstate commerce law as would be held to repeal the State law by implication. Thouvenin v. Rodriguez, 24 Texas, 468, 478, 479; Rogers v. Watrous, 8 Texas, 62, 65; The License Cases, 5 How., 504.

4.    If, however, it should be held that the law under which this suit is brought was, in its application to shipments of goods made from without the State, *pro tanto* superseded by the interstate commerce act, still the vested right to recover the damages already incurred would be property in the same sense in which tangible things are property, and would be equally protected against arbitrary interference by subsequent legislation.

5.    The appellant acquired no claim against the appellee, and no lien upon his goods, by paying or agreeing to pay to connecting lines charges for which neither he nor his property was liable, and if the appellant has incurred loss or liability with reference to such illegal charges he must look for redress to the connecting lines with which he contracted, and can not shift the burden upon the appellee who is in no default.

*On Cross-Appeal.*—1.    The exhibition of the bill of lading would have been a useless act, and even if otherwise necessary was waived by the declaration and conduct of the defendant's agents.    1 Ct. App. C. C., sec. 289, and authorities cited; Abb. Trial Ev., pp. 816, 817, and authorities.

2.    The court erred in refusing to charge the jury as requested by the plaintiff in his fifth refused charge, as follows:

"5.    The defendant company would have no right to require of the plaintiff a receipt for the alleged overcharge, such as has been read in your hearing, and if the defendant or its agents demanded the signing of such a receipt as a condition to the delivery of the goods on tender of

the freight rate stipulated for, and refused to deliver them unless such receipt was given, such refusal would be unlawful, and would subject the defendant to the penalty of the statute."

It is submitted that the defendant had no more right to exact of the plaintiff an acknowledgment of the payment of money which he had not in fact received, and the release without consideration of any claim under his bill of lading, than it had to require the surrender of the bill of lading itself, as claimed on the former appeal. Dwyer v. Railway, 69 Texas, 707, 710.

*J. W. Terry,* for appellant, in reply.—1. It being provided in the bill of lading that it should be presented without alteration or erasure, the presentation of the bill of lading was a condition precedent to plaintiff's right to demand a delivery of the nails, and no demand to see the bill of lading by defendant was necessary, it being the duty of the plaintiff, under the terms of the contract, to present the same, and such contract itself being a demand on the part of the carrier for its presentation. Dwyer v. Railway, 69 Texas, 707.

2. It being necessary for defendant to see the bill of lading in order to determine whether the proper amount was tendered, independently of any stipulation in the same, it was the plaintiff's duty to present the same to defendant in connection with the tender, and no demand for its production was necessary.

3. The fact that defendant's agent informed the plaintiff that the nails would not be delivered without a surrender of the bill of lading was not in itself, as matter of law, a waiver of the production of the bill of lading, but merely evidence from which the jury might find such waiver. The court properly charged the jury, at the instance of the defendant, that the plaintiff was bound to present the bill of lading, "unless you should believe from the evidence that the presentation of said bill of lading was waived by the defendant or its agent Allison," and this was a sufficient presentation of the issue to the jury.

4. Under all of the authorities, to constitute a valid tender (unless the article be too bulky for convenient handling), the thing to be tendered must be present at the time the tender is proposed, and unless it be so present a declaration that the tender will not be accepted is of no effect. Hence, if a tender of presentation of the bill of lading was required, the declaration of the agent would not amount to a waiver of the tender unless the plaintiff's agent had the bill of lading present, ready to tender; and that being a disputed issue, at the utmost the plaintiff was only entitled to go to the jury on that issue, and the fourth charge refused, not embracing that issue, was too broad, and was properly refused. Abbott's Trial Ev., 816, 817; 7 Wait's Act. and Def., 587.

5. The court having distinctly charged the jury that if the plaintiff

had tendered the amount of freight shown by the bill of lading, accompanied by a presentation of the bill of lading, without a surrender of the bill of lading, he was entitled to recover, it was unnecessary to charge them that defendant could not demand the receipt referred to; and further, the fact that such receipt was never given, in connection with the fact that the jury found for the plaintiff, shows that he was not prejudiced by the refusal of the charge set out in the plaintiff's second assignment.

6.   It was not unreasonable to require of plaintiff a receipt for the difference in the freight as shown by the bill of lading and waybill, the same being of value to the agent as evidence with which to relieve himself of the charge made against him by the waybill, and of value to the defendant as evidence in collecting from the initial line the difference between the two charges, and the giving of the same being of no possible prejudice to the plaintiff or his rights.   The requiring of such a receipt is not upon the same footing as requiring the surrender of the bill of lading.   The plaintiff, by his own assignments, having brought the question to the attention of the court, shows that he has no case, and the court should reverse the judgment in his favor upon the ground that he shows that the receipt was legally demanded and never given.   If we are correct in the claim that defendant had the right to ask for such receipt, then plaintiff's second assignment amounts to a confession of error, for which the judgment should be reversed and rendered for defendant.   Dwyer v. Railway, 69 Texas, 710.

GAINES, ASSOCIATE JUSTICE.—This case was before this court at a former term, and was reversed and remanded for a new trial in accordance with an opinion which is reported in 69 Texas, 707.   The question then presented is not now involved.   The action was brought by appellee against appellant to recover the penalty prescribed by the Act of May 6, 1882, for the failure of the company to deliver to him certain merchandise transported by it upon his tender of the charges for carriage specified in the bill of lading.   The defendant interposed an exception to the petition and now insists that the court erred in overruling it.

The bill of lading was for a certain car load of nails received at the city of Pittsburg, in the State of Pennsylvania, by the Pittsburg, Cincinnati & St. Louis Railway Company, and bound that company to transport the merchandise from that city to the city of Brenham, in the State of Texas, for a freight charge of $197.50.   The statute under which the proceeding was instituted reads as follows:   "That any railroad company, its officers, agents, or employes, that shall refuse to deliver to the owner, agent, or consignee, any freight, goods, wares, and merchandise of any kind or character whatever, upon the payment or tender of payment of the freight charges shown by the bill of lading, the said railroad

company shall be liable in damages to the owner of said freight, goods, wares, or merchandise to an amount equal to the amount of the freight charges for every day said freight, goods, wares, and merchandise is held after payment or tender of payment of the charges due as shown by the bill of lading, to be recovered in any court of competent jurisdiction." Laws of Called Session of 17th Leg., 35.

It is urged that the law as applied to the transaction alleged in the petition is a regulation of commerce between the States, and is such as only the Congress of the United States has the power to make. If so, the Legislature had no power to make such a law in reference to bills of lading for the carriage of goods from another State into this State, and it would be our duty either to construe the act as not applying to such bills of lading, or to hold that as so applied it is in contravention of the Constitution of the United States, and therefore void. We would not, however, in construing the act, give it an application that would render any part of it void unless the intent to so apply it was made manifest by the language of the act itself.

But the question recurs, is the provision under consideration in contravention of the Federal Constitution? As to what laws passed by the Legislature of a State are to be deemed a regulation of commerce between the States within the meaning of that Constitution there have been numerous decisions in the courts of the United States. Considering the all-pervading influence of the commerce of the country, and that any State law in relation to commercial transactions not confined to those begun and completed within the State would almost necessarily affect in some degree the commerce between the States, the result is not surprising. From the opinions delivered in the case of the Wabash Railway Company v. Illinois, 118 United States, 557, it would seem that the decisions of the Supreme Court of the United States upon these questions have not been altogether consistent, but it also appears from that and later cases in the same court that the tendency now is to extend the power of Congress over matters affecting interstate commerce, and correspondingly to restrict that of the States. We think, however, that by the decisions of that court (which are authoritative upon these questions) the following propositions must be deemed to have been settled:

1.   That a State can make no law regulating the rate of freight for the carriage of goods between that and another State, although the regulation be construed as applying only to so much of the line of transit as lies within its own borders. Wabash Railway Co. v. Illinois, *supra.*

2.   That it can make no law which imposes either directly or indirectly a burden by way of taxation upon interstate commerce. Pickard v. Pullman, 117 U. S., 1; State Freight Tax Case, 15 Wall., 232; Gloucester Ferry Co. v. Pennsylvania, 114 U. S., 196; Walling v. Michigan, 116 U. S., 446; Telegraph Co. v. Texas, 105 U. S., 460; County of Mobile v.

Kimball, 102 U. S., 691; Robbins v. Shelby Taxing District, 120 U. S., 489; Leloup v. Mobile, 127 U. S., 640; Asher v. Texas, 128 U. S., 129.

3. That wharves and bridges and ferries across streams constituting the boundaries between the States may be established and regulated by the States in the absence of legislation on the same subject by Congress, provided no burden other than an ordinary charge for their use be imposed upon the commerce passing over them. Gilman v. Philadelphia, 3 Wall., 713; Escanaba Company v. Chicago, 107 U. S., 678; Transportation Co. v. Parkersburg, 107 U. S., 691.

4. That in the exercise of their police powers, the States may enact laws which, though they affect commerce between the States, are not to be considered regulations of that commerce within the meaning of the Constitution of the United States. Railroad Co. v. Fuller, 17 Wall., 560, and cases there cited; Smith v. Alabama, 124 U. S., 465.

Is the law in question in this suit a proper exercise of the police power of the State? This power relates to such a number and variety of subjects that it is impossible to define it, except in terms so general that the definition is of but little practical utility in any case difficult of solution. We think, however, the opinions in the cases last cited throw much light upon the question before us.

In Railway Company v. Fuller the question was as to the validity of a statute of Iowa, which required all railway companies in the State, in September of each year, to fix their rates of fare for passengers and freight, and on the 1st day of October following to post up at their depots a printed copy of such rates, and to cause a copy to remain posted during the year, and subjected the companies to penalties in case of a failure to comply with its provisions. In the conclusion of their opinion the court use this language: "If the requirements of the statute here in question were * * * *regulations of commerce*, the question would arise whether, regarded in the light of the authorities referred to, and of reason and principle, they are not regulations of such a character as to be valid until superseded by the paramount power of Congress. But as we are unanimously of the opinion that they are merely police regulations, it is unnecessary to pursue the subject."

In Smith v. Alabama, *supra*, the court say: "A carrier exercising his calling within a particular State, although engaged in the business of interstate commerce, is answerable, according to the law of the State, for acts of nonfeasance or misfeasance committed within its limits. If he fail to deliver goods to the proper consignee at the right time or place, he is liable to an action for damages under the laws of the State in its courts; or if by negligence in transportation he inflicts injury upon the person of a passenger brought from another State, a right of action for the consequent damage is given by the local law. In neither case would it be a defense that the law giving the right to redress was void, as being

an unconstitutional regulation of commerce by the State. This, indeed, was the very point decided in Sherlock v. Alling, 93 United States, 99."

The statute we have under consideration, like every other law which gives a remedy to the shipper against the carrier for a violation of his contract, does in some remote degree affect interstate commerce when applied to a contract of carriage from one State to another. But it imposes no tax; it neither fixes nor regulates any rates; it makes no discrimination between commerce wholly within the State and that between the State and other States; it imposes no duty upon any carrier not already imposed by the common law. It applies to all railroad companies in the State and to all contracts of carriage alike, and merely provides a penalty for the purpose of enforcing a compliance with an obligation which already existed at common law. In respect of the question before us the statute is not distinguishable from any other law affording a remedy for the breach of a contract of carriage of goods between two States.

We conclude that the statute was a proper exercise of the police power reserved to the State and is therefore valid. The court therefore did not err in overruling the defendant's exception to the petition.

In answer to the petition the defendant pleaded that the shipment which gave rise to this controversy was over the Pittsburg, Cincinnati & St. Louis Railway to St. Louis, and thence over the Texas & St. Louis Railway to McGregor, Texas, where the freight was delivered to its road for transportation to Brenham; that the Pittsburg, Cincinnati & St. Louis company had no authority to contract for the carriage of the nails over its road, and that its agents at McGregor received the freight for transportation to Brenham at its customary rates without having any knowledge of the bill of lading executed by that company; that upon receipt of the freight it paid the accrued charges as shown by the way-bill to be $197.50, and that its charges in addition amounted to $35. The entire charges as shown by the bill of lading were $197.50.

The defendant introduced evidence of the facts alleged in its answer, and the court charged the jury as follows: "If the court believe from the evidence that the defendant company received the nails at the town of McGregor from another company and transported them to the town of Brenham, this would constitute an affirmance of the original contract of shipment, and the defendant thereby became bound by the terms of the shipment as shown in the bill of lading."

In this we think there was error. Our statutes make it obligatory upon every railroad company in this State to draw over their road without delay the passengers, merchandise, and cars of every other railroad company which may enter and connect with their road. Rev. Stats., art. 4251; see also arts. 4226, 4227, 4251, 4254. In the absence of a provision of this character it might be proper to hold that a carrier who has received freight from another carrier upon a through bill of lading, without any

express agreement as to the charges, should be presumed to have ratified the bill of lading, though made without its authority, and to have become a party to the contract. But certainly when the carrier is bound by statute to receive and transport the goods without delay upon tender by the connecting carrier no such presumption should be indulged. Such a rule would be to force a contract upon a carrier to which he had not given his consent, and compel him to carry at a rate fixed by another company. The result of the construction of the law by the court below is that a railroad company is not permitted to refuse to receive the goods for transportation, yet if it does receive them it ratifies by that act a bill of lading made without its authority. This, in our opinion, can not be tolerated. We so held at the last Tyler Term in a case not yet reported. Should a railroad company in Arkansas receive freight to be transported to El Paso, in this State, for a less charge for the whole distance than the customary charge of the Texas road for the transportation over its own line, could the latter be forced to accept the contract? We think not. We do not think the Legislature intended that such a construction should be given to the statute under consideration. Our opinion is that the act only applies when the railroad company that is sought to be charged in damages has either itself executed the bill of lading or authorized another company to execute it, or has ratified it by some voluntary act on its part. Instead of the charge complained of, the court should have given an instruction in substance the same as charge No. 1 requested by defendant.

We think the court should not have excluded the original waybill when offered in evidence. In connection with other testimony it showed that defendant paid at the time it received the nails accrued charges amounting to as much as the entire charge agreed upon in the bill of lading for the transportation of the property for the whole distance, and tended to show that it never intended to ratify that contract.

We infer from the statement appended to the bill of exceptions that the depositions of the witnesses Murray and Dodge were objected to in writing, and were suppressed at a term of the court previous to the trial. If so the bill of exceptions should have been then taken, and the depositions were properly excluded when offered on the trial.

The plaintiff has filed cross-assignments of error. The goods were first demanded on the 15th of December, 1884, and again on the 27th of January, 1885. On both occasions the charges shown by the bill of lading were tendered. There was a dispute whether or not the bill of lading was presented at the time of the first demand. It was formally exhibited to the company agent when the second tender and demand were made. Under these circumstances the court charged the jury, in effect, that in order to make the demand effectual under the statute the plaintiff must at the time have exhibited his bill of lading; and refused to charge that such presentation of the instrument was not necessary. We are of opinion that

the court erred in these rulings.   The statute does not expressly require
that the bill of lading shall be shown to the agent of the railroad com-
pany when the goods are demanded; nor·do we find anything in either
the words of the act or the nature of the business from which it ought
reasonably to be inferred that the Legislature so intended.   It is to be
presumed, as a matter of law, that a party to a contract knows its con-
tents; and as a matter of fact it is not unreasonable to suppose that the
agents of a railroad company who receive freight at its destination know
the charges which the company is entitled to receive, as shown by the
bill of lading.   We think, therefore, that it was not intended that the
exhibition of the bill of lading at the time of the tender of the money
and demand of the goods should be a condition precedent to the recovery
of the damages.   But the statute is strictly penal, and the penalty is se-
vere, and we think a case may arise in which the owner of the goods
should not recover if he has refused to exhibit his contract.   It is only
for a willful disregard of the law that its penalties should be inflicted.
Hence, if there should be a mistake, if the agent of the company should
not in fact know the contents of the bill, and should the owner of the
goods, having it in his power, refuse to produce it, he would not be en-
titled to recover.

In regard to appellee's second assignment of error it is sufficient to
say that it was decided upon the former appeal that the defendant had no
right to require of plaintiff a receipt for the overcharge, and that if such
a right should be insisted upon on another trial, it would be proper to
instruct the jury that it did not exist.   If no issue should be again made
upon the question we do not see that such an instruction would be either
necessary or proper.

For the errors pointed out the judgment is reversed and the cause re-
manded.   Each party will pay one-half of the costs of this appeal.

*Reversed and remanded.*

Delivered January 14, 1890.