S. A. & A. P. R'y Co. v. Henry Wilson.

(No. 7635.)

Appeal from DeWitt County.    Opinion by Simkins, J.

Stockdale & Proctor, counsel for appellant.

Kleberg & Pleasants, counsel for appellee.

**§ 323.** *Agent; want of authority of to execute instrument sued upon must be presented by a sworn plea.* This suit was instituted by appellee, Wilson, October 22, 1888, in the county court of DeWitt county against appellant to recover the amount due on a certain due-bill or time-check in writing, issued in favor of appellee by J. P. Nelson, appellant's agent, and also for statutory damages provided for under the act of the twentieth legislature, page 72. This time-check was given for the amount of wages due for services performed by appellee as employee of appellant in the construction department of appellant's railway. Demand was made of appellant by appellee for said wages at its nearest station agent in DeWitt county, as well as upon its principal officers in the city of San Antonio, within the time required by law. The amount sued for was $510 with legal interest upon same from September 1, 1888, and twenty per cent. additional upon said amount as damages for appellant's failure and refusal to pay said wages within fifteen days after the demand as aforesaid, under and by virtue of said act of the legislature above mentioned, approved March 30, 1887, page 72. This act is in the following language, to wit: "That whenever any railroad company shall discharge any employee, or whenever the term of service of any employee of a railroad company shall expire, or whenever any railroad company shall be due and owing an employee, such railroad company, upon such discharge, or upon the termination of the term of such service, or upon the maturity of such indebtedness, shall, within fifteen days after demand thereof upon the nearest station agent of such railroad company, pay to such employee such amount due and owing him; and in case said railroad company fails or refuses to pay such employee, then it shall be liable and shall pay to such employee twenty per cent. on the amount due him, as damages, in addition to the

amount so due, in no case the damages to be less than five nor more than one hundred dollars."

Appellant demurred generally and specially to plaintiff's petition, and his demurrer and exceptions were overruled. He also pleaded a general denial, and by special plea, but not under oath, denied any agency ever existed between appellant and Nelson; he also denied Nelson had authority to issue any obligation binding upon appellant.

The matters of law and fact were submitted to the court, which thereupon rendered judgment for appellee for the amount of the obligation sued upon, with legal interest thereon as claimed in the petition, and the further sum of $100 damages, under and by virtue of the act of the twentieth legislature above quoted.

The plaintiff, not having pleaded *non est factum*, cannot be heard to question the authority of Nelson, its agent, to execute the instrument sued on.

In the City Water Works v. White, 61 Tex. 536, it was held that "the denial of the execution of an instrument in writing on which a pleading is founded in whole or in part, and which is charged to have been executed by defendant, an incorporated company, must, under article 1265, Revised Statutes, be verified by affidavit. The fact that the instrument set forth in the pleading is ambiguous on its face, and does not clearly by its terms purport to be the act of the company, does not vary the rule." And see authorities cited in this case. [Austin v. Towns, 10 Tex. 24; Sessums v. Henry, 38 Tex. 37.]

§ **324.** *Constitutional law; railways have a public and a private character; power of legislature to impose a penalty upon for failure to pay employee within a prescribed time.* But appellant insists that the above act is unconstitutional and void, because in violation of article 10, section 2, of the constitution. This question is one of importance. The validity of a legislative act is necessarily involved, and this court must declare whether the

law-making power of government has exceeded its constitutional limits in assuming to legislate where it should not. It need not be said that this is always a question of great delicacy, and one which the true judge ever approaches with profound reluctance. But the question has been fairly presented to this court and must be met. Has the legislature the power to provide a penalty against a railroad company for failing to pay its employees their wages when the same are due? Such legislation can be sustained only upon the theory that railway companies are public in every respect, and the legislature has a right to regulate them, not only in matters relating to their duties as public carriers, but also in all their internal economy. It cannot now be questioned but that railways occupy a twofold character — public and private. As a highway exercising the sovereign right of eminent domain, and with its exclusive privileges and its great monopolistic power over the commerce and traffic of the people, it is essentially public in all of its relations and duties as a public carrier, and the state must see that the great trust is not abused, and that its duties are properly performed. [Munn v. Illinois, 94 U. S. 113.]

Under article 10, section 2, of the constitution, the public relations of the railways of the state are those of a common carrier, and the legislature is empowered thereunder to determine what are the abuses, unjust discriminations and extortions in rates in freight and passenger traffic, and to pass all laws to correct the same, and has full power to pass laws establishing reasonable maximum rates of charges for the transportation of passengers and freight on railroads, and to enforce all such laws by adequate penalties.

It is to be observed that the provisions of this section are mandatory. "The legislature shall pass laws," etc. While it is true the legislature has the right to pass laws upon all subjects not forbidden by the constitution of

the state, or of the United States, yet it is also true that
the constitution often speaks in imperative terms, re-
quiring the passage of certain laws.    There is constant
growth and progress in a people as in the individual, and
the organic law must reflect the *status* of the people.
Changes are slowly made, and are for a long time
thwarted by constitutional inhibition, until at last the
issue is made and becomes a part of the constitution.
The construction to be placed on such portions of the
constitution is, that the people have said what they de-
sire on the question, and all that they wish to say.    This
is well illustrated by the railway agitation in all of the
states of the Union which led to the adoption of article
10, section 2, in Texas, and similar provisions in the va-
rious states.    There is no question as to the scope of this
section.    Its provisions necessarily refer to and contem-
plate injuries to the public arising out of a violation of
its duties as a common carrier, and nothing else; that is
to say, the abuses, unjust discriminations and extor-
tions, and the establishment of reasonable rates, and en-
forcing such laws by penalties.    Within this broad field
it rests with the legislature to determine what are those
duties to the public and what constitutes abuses; and
also what remedies are necessary to prevent them, and
to decide whether the abuses shall be corrected through
statutes which declare the act or acts to be a crime, pun-
ishable as such, or whether the act or acts shall be cor-
rected through a civil action with  punitive damages.
. Under this head are to be referred all the various laws
upon our statute books in reference to the railways and
their relations to the public, and their right to enact
these laws is sustained by the United States supreme
court in the Granger Cases, and many subsequent cases,
by the decisions of the highest courts of the several
states, and by our own courts.    In the case of H. & T.
C. R'y Co. v. Harry & Bros., 63 Tex. 256, the supreme
court upheld the validity of a statute authorizing the re-

covery of an amount equal to the freight charges for every day's wrongful detention of freight, the same being passed in obedience to section 2, article 10. [See, also, R. R. Co. v. Dwyer, 75 Tex. 580; H. & T. C. R'y Co. v. State, 61 Tex. 343; 2 Civil App. 491.] Upon similar grounds are sustained statutes making railway companies liable in double their value for the stock killed when roads are required but fail to fence their roadways; that is to say, they are sustained on the ground that killing stock by engines endangers the lives of the traveling public. [R. R. Co. v. Humes, 115 U. S. 572; 82 Mo. 221.] But when we consider the relations of railway companies to its own servants, both as to contracts of employment and payment, we find a field in which special legislation has no right ordinarily to enter except in favor of life, and in which railways stand on the same footing with all other corporations or persons, and which cannot be contemplated in section 2, article 10. The relation of master and servant must ever be purely voluntary, resting on contract of parties. The employer and employee must always deal at arms' length; their interest in making the contract is always adverse. The employee always seeks the highest wages for the least amount of work and the employer the greatest amount of work for the least pay. Unquestionably so long as men must earn a living for their families and themselves by labor, there must be, as there always has been, oppression of the working classes. Yet the law has never undertaken, except in a limited extent and upon principles of pure justice, to lift them above the plane of equality upon which all should stand alike before the law. [Freedman on Pol. Lim. 571.]

In Texas the constitution has made innovations on the common law by exempting current wages, giving liens to mechanics and material-men, and by protecting laborers' wages against contractors on public works and railways [art. 16, secs. 35 and 37]; the intention being to

preserve the rights of the laborer engaged in the construction of railways, etc., and not those regularly engaged in its service, and the method of protection indicated is by lien. But, conceding for the present that the legislature has the right to enforce ordinary labor claims by penalties, they certainly cannot select out a certain class for the exercise of such legislation. The doctrine is often stated that a statute is general and uniform in its operation when it affects equally all who are brought within the relations and circumstances provided for, though it may not operate on every citizen. [3 Am. & Eng. Enc. Law, 697.]

But it by no means follows that the legislature has the right to impose any burden simply by placing it upon a certain class. It must rest upon some reason upon which it could be defended. [Cooley, Const. Limit. 395.] Unquestionably the legislature, in the exercise of its police power, may subject any occupation, business or class to reasonable regulations when required by public interest or welfare. But in all illustrations of the exercise of this power it will be found there was some circumstance of threatened damage to the public or others that required the regulation. [Freedman on the Lim. of Police Power, 197.] And no well considered case can be found sustaining a penalty on an ordinary contract where public interest was not actually involved. Much less can it be shown that contract debts of a named class were singled out and a penalty attached. It may be stated as an established maxim of state polity that legislative authority cannot reach the life, liberty and property of an individual except where he is convicted of crime, or the sacrifice of his property is demanded by a *just regard to public welfare.* [Taylor v. Potter, 4 Hill, 745; Mayor v. Yuille, 3 Ala. 137; Wilkinson v. Leland, 2 Pet. 658; Freedman on Police Lim. 236, 237.]

In Wally v. Kennedy, 2 Yerger, 554, the court says: The rights of every individual must stand or fall by the

same rule that governs all other members of the body politic under similar circumstances, and every special law which affects individual rights, or does the same thing by restricting the privileges of *certain classes of citizens and not of others when there is no public necessity for such discrimination, is unconstitutional and void.*

Before the tribunals of justice, the ordinary litigant can only recover his interest and costs, and where there is fraud or acts on the border land of crime, he may recover exemplary damages, as recompense to himself and punishment to the offender. [Sedgwick on Damages, 371; 115 U. S. 521.] And where the process of the court is used for wrongful purposes, as in appeals for delay, or making false claims, ten per cent. damages are assessed; but these rights belong *to all suitors alike,* and the law is uniform and common to all. Such is the "known course of the law of the land" and "due process." An exception that undertakes to single out a single class and attach a penalty to their failure to pay one class of their contracts is not due process and cannot be sustained. [In re Ziebold, 19 U. S. Cr. Rep. 742.]

The proposition here is to single out railway companies and attach a penalty of twenty per cent. for failure to pay servants' wages. It is impossible to regard the excess beyond the amount of the debt other than penalty. It is not resting in contract, but is a penalty or fine for punishment. It does not apply to telegraph, telephone or express companies, warehouses, elevators, mills, street railways, gas and electric companies, or hotels, or any of the various enterprises of public necessity, interest and convenience to which it might properly be applied.

It cannot be contended that the employment and payment of the labor on railways is a matter affected with a public interest, for then it follows, under Munn v. Illinois, 94 U. S. 125, that the state has the right to regulate the amount paid, and therefore the amount and character of the work to be done. [Mayor v. Yuille, 3

Ala. 137; Chicago Railroad v. Iowa, 94 U. S. 155; Peek v. Chicago Railroad Co., 94 U. S. 164; Water Works v. Schotler, 110 U. S. 347.]

Acts of the character under discussion have so seldom been passed by the legislatures that authorities are by no means abundant.

In the case of Atchison, etc. R'y Co. v. Baty, 6 Neb. 37, appellant recovered *double* the value of certain hogs killed by the cars of appellant, under the statute of Nebraska requiring double the value of the property killed or injured to be paid when the company failed to pay in thirty days after demand.

The question considered was, was such a statute "the law of the land?" The court says the terms do not mean "a legislative act." If they did, every restriction upon legislative authority would at once be abrogated. For what more can a citizen suffer than to be taken, imprisoned, disseized of his freehold, liberty and privileges, be outlawed, exiled and destroyed, and *be deprived* of his property, his liberty, his life, without crime. Yet all this he may suffer if an act of the assembly simply denouncing these penalties upon particular persons, *or a particular class of persons,* be in itself the law of the land in the sense of the constitution. Citing Hoke v. Henderson, 2 Dev. 15. "Whatever the object of such legislation may be, it is certainly taking private property of one and giving it to another by legislative decree."

If the legislature desires to interfere at all in the enforcement of labor claims, it must do so by laws equal in their operation and protecting alike the interest of the employer and employee — for the law knows no favorites.

In Millet v. People, 17 Ill. 294, the supreme court held an act unconstitutional requiring owners or operators of mines to provide scales for weighing coal *and make the weight of the coal the basis of the wages.* The court says: It is not competent for the legislature, under the

constitution, to single out owners and operators of coal mines, and provide that they shall bear burdens not imposed on other owners of property or employers of labor. Such legislation cannot be sustained as an exercise of police power.

In The State v. Goodwill, the court held unconstitutional an act prohibiting persons engaged in mining and manufacturing from paying off their hands in orders, unless said orders complied with certain terms. The court says: "It is to be observed that this act applies to certain specified classes of persons, firms and corporations and none others. It does not include the vast number of others to which with propriety it might, if a necessity exists for the law. In those occupations where the business implies a trust or public duty the government has the power to see that the trust is not abused and the duty is properly performed. On this principle statutes have been upheld which regulate the charges of railway companies, elevator, telephone, telegraph and other companies, hackmen, warehousemen, mills, etc., but *we are aware of no well considered case in which a statute has been upheld that undertook to regulate the dealings between employer and employee,*" etc. [10 S. E. Rep. 287.] And the same court (W. V. supreme court) on the same grounds declared unconstitutional the portion of the act prohibiting corporations from selling merchandise to their employees at a greater price than they sold to others not employed, because it was class legislation and an unjust interference with private contracts. [State v. Fire Creek Coal Co., 10 S. E. Rep. 288.]

In the Civil Rights Cases, the supreme court of the United States says, in speaking of the fourteenth amendment: It nullifies and makes void all state legislation and state action of every kind which impairs the privileges of citizens of the United States or injures them in life, liberty or property without due process of law, or denies the equal protection of the laws. [109 U. S. 17.]

What is called class legislation would belong to this category and be obnoxious to the fourteenth amendment. [109 U. S. 24; San Mateo v. S. P. R. Co., 8 A. & E. R'y Cases; Hurtado v. State, 110 U. S. 525; Wally v. Kennedy, 2 Yerger, 554.]

It is to be observed that the act in question providing for the payment of twenty per cent. on the amount claimed as damages makes no allowance for disputes in good faith of the amount on the part of the company, nor for any circumstances, however justifiable, which might delay the payment within the time fixed; nor for any redress of the road for plaintiff's failure to establish his demand; nor for any right of the road to collect sums due it from its customers where the same is necessary. If the legislature, for the purpose of enforcing the payment of employees' wages, can pass a law like this imposing twenty per cent. on the amount due, does it not imply a power to make it ten times the amount claimed? If, then, legislative power exists to pass such a law as this, on the same principle why can the legislature not apply it to any simple debt, and if on demand of the creditor the debtor fails to pay by a given time, fixed by the legislature, make him pay double or treble the amount according as the legislative enactment may direct? Whatever the *object* of such legislation may be, it eventuates in a decree taking property from one person and giving it to another. [Atchison, etc. R'y Co. v. Baty, *supra.*]

It may be claimed that because the railways are public highways and common carriers and their efficiency in public service largely depends on the promptness and fidelity of their employees, that unless the employees are promptly paid it will lead to poor service, strikes and consequent disaster to the interest of the public at large, and therefore the public interest demands their prompt payment. The great difficulty with this argument is to limit it, for it extends with more or less force to every public enterprise and agency that contributes to

public necessity and convenience. Again, if it be admitted that public interest requires prompt payment to prevent strikes and obtain good service, then the state should regulate the amount to be paid, for that is the most fruitful source of strikes. Again, to regulate the amount implies a regulation of the quality and kind of labor, and by an easy gradation we get to the right of the state to put men in the various offices to operate and manage the roads, as in fact is largely done now by the courts; and then we would have reached all that is implied in the term government ownership of railways without the state's having a dollar's interest therein. Be that as it may, we cannot see how public interest can be subserved by a statute so unequal, special and unjust as the one under consideration. Even in those writers where a distinction is drawn between employments connected with public service and those not so directly connected, and where it is claimed the state may in its exercise of police power appoint a tribunal and compel all parties to submit their differences to it for adjustment, we find the claim is not only based on public welfare, but because it is for the benefit of both parties and not for the benefit of the operatives alone. Such, however, is not the class of legislation here considered. [Freedman on Pol. Lim. 573.]

We think the act unconstitutional and the court erred in rendering judgment for the penalty. The judgment is reversed and here rendered for $510 with interest from September 1, 1888.

June 25, 1892.        Reversed and rendered.